Our next case for argument is 22-1228 FS.com v. ITC. Counsel, please proceed. Counsel, please proceed. May it please the Court, Darlene Gavini for Appellant FS.com. The legal question on enablement, which we ask you to review de novo, is whether the Commission properly applied the correct meaning of inherent in finding the existence of an inherent upper limit in the challenged open and range claims and finding those claims enabled by the patent. So you're saying it's not a – I mean, otherwise enablement is a question of law based on underlying facts, but you're saying here there's only a legal question and the legal question is what the scope – bad word to use – what the definition of inherent is? Yes, Your Honor, this is essentially a claim construction dispute. Before an enablement inquiry can proceed, the scope of what needs to be enabled must be determined. The more that is claimed, the more must be enabled. Look, I'm really very sympathetic to what you're arguing right now. The claim – for example, Claim 1 says at least 98 fiber optic connections. The spec undoubtedly discloses 144, right? So if at least 98 – if the board says there's an inherent limit, I'm a little baffled at the idea there's an inherent limit, but we can't tell you what it is. It's like a big secret. What's the inherent limit? So if they said it was 98 to 144, I think there's enablement, right? But if they go above 144 to try to get to like 576 or something, we've got a real problem because that technology didn't even exist at the time. So why isn't the solution here to re-vacate Romand and tell the board they've got to tell us what this inherent upper limit is so that we can properly assess enablement? The outcome would not change, Your Honor. The board – I just described to you a scenario where the claims are fully enabled. The – Well, what would you say the appropriate claim construction is? We don't know what the inherent limit is, but what we do know is that the claims only teach up – the specification only teaches up to 144. So the court in the ITC found an upper limit, which presumably is 144 by crediting the expert testimony. So you would say that's the correct way to construe the claims? The claims should be construed only to get to a limit of 144? Yes, Your Honor. Our position is that that is not an inherent limit. An inherent limit is something that doesn't change. An example of an inherent limit is a percentage, 100%. A claim – Do you have a claim differentiation problem if you limit it, if you construe that to mean only 144? Isn't that what the dependent claims say? Isn't that the difference between the independent and the dependent? There is, but the at least – the claim says at least, and that is in open-ended range, and unless there's an inherent limit found by the court construing that claim, it's not enabled. Now, we would agree that up to 144, the dependent claim is enabled. Anything above is not. Well, but if a skilled artisan would know the highest you could go at this point in time was 144, why isn't that the inherent limit? Because an inherent limit under this court's precedent does not change, and the record evidence – If at this point in time you can't go above 144, it's not going to change. The evidence shows it did. Well, but if the inherent limit is 144, and now you can do 576, 576 isn't included in this claim because this claim has an inherent limit of 144. So the claim has a limit of 144. That limit is not inherent. An inherent limit is something that – And so writing this claim in the context of what's going on in the field and the art, they meant the inherent upper limit to be 144. The fact that new discoveries are made later doesn't mean that they can now expand their patent beyond that. It's only enabled up to what was the inherent upper limit at the time this patent was done. So we absolutely agree that the upper limit known at the time was 144, but that limit is not inherent. Inherent limit, again, something like the speed of light. Why isn't it inherent? At that time, nobody could have done anything beyond 144. Inherent means for all time. It does not change. Anything that can be – What if we disagree with you about that? What if we agree that inherent has to be looked at what was technologically capable at the time, and if the upper limit was absolutely 144, it was an inherent limit, and nobody could go beyond that, isn't this enabled? The specification is enabled up to 144, but that's not what the claim says. The fuss here, I mean, I thought we were all on sort of taking your side. These seem to be friendly questions, but now I'm wondering if – because you think this is an enablement problem and the claims should be struck versus our being able to construe the claims in a narrow way, much narrower than arguably the ITC did, but not striking the claim. Is that why we're having a fight here or why we're having a disagreement? We agree that the construction should be narrow, and if that's what this court finds, we do not dispute that. If it were remanded, the Corning has – And then did the ITC apply this to products that were above 144? It did. And what was their basis for that? Their basis was that the specification did not – a person of ordinary skill in the art would understand from looking at the specification that they could reach densities of more than 144, up to 432 connections per use space, without undue experimentation. Now, based on evolution of technology, but not at the time this patent was written. The ITC found that even if the inherent upper limit were 432 connections, that the specification caught up to that limit, which is contradictory. It's trying to have it both ways. I think that's why I started by trying to suggest to you that I think that these are meant to be friendly questions. I mean, I read this, and I don't see how there's enablement for anything above 144. And that is the only way these claims can be deemed enabled, if there's an inherent limit, and it's found to be 144. If that's the case, these claims are in fact enabled. Now, it may create a scenario where other aspects of the decision have to be vacated and remanded, and you can tell us about what that would entail. But I guess one of the things that baffles me is that you said – you started by suggesting that the ITC had in fact found that the inherent limit was 144. Maybe I misunderstood you, but I read the ITC opinion as sort of declining to say precisely what the inherent upper limit was, which caused me a problem, and I was originally leaning towards vacating or remanding and forcing them to name the upper limit, which I think is 144. So help me understand what's wrong with what I'm saying. There's another – aside from remanding, there's nothing wrong. You're exactly right, Your Honor. It's unclear what the ITC found to be the upper limit. All that they said was there is some inherent upper limit. But when it applied the enablement test to that heretofore unknown scope, whatever the upper limit was, it found that the specification enabled that. Now, if the upper limit is – I'm a little confused too now because I thought that the ITC had limited – what was technologically available at the time. Correct, and they improperly excluded evidence to elucidate the scope of the claims at the time of the filing of the patent, and that evidence was – But let me follow up on that because this is – again, this I think is – if that was what made it enabled, that it was an upper limit that was known at the time, but then they turned around and applied it to things that evolved later, then that seems – if we're constraining the claim in a way to make it enabled, then they're violating what at least has to be an implicit claim construction to limit this. If what you say is correct, that they applied this and excluded goods that went above that 144 category. I mean, I guess the ITC can answer that better, but – The ITC went above the – whenever they determined the inherent upper limit to be by finding that the specification enabled densities greater above that inherent – My clerk just told me, and maybe my clerk is wrong, but my clerk just told me the products at issue in this case, the ones that are subject to this entire proceeding, operated 144. That's correct. Well, then didn't you just tell Judge Hughes a few minutes ago that no, the ITC applied this, in this case, to products at like 476 or something? I don't remember the number. I don't either, but you told me that they excluded products that included above 144. Is that incorrect? They did that when determining what the inherent upper limit was. Then in determining whether there was undue experimentation, they found that – I don't understand what you're saying. My clerk said that the products at issue in this case were 144. Is that correct? It's correct. So if this is enabled up to 144 because that was the state of the art at the time and all they excluded was products up to 144, what's the problem? The problem is that Corning and Corning's expert admitted that connections higher than 144 fell within the scope of the claims. And Corning has not – Who cares what Corning thinks? What's up with that? The ITC implicitly adapted that. I don't think they did. I think the ITC said there's an inherent upper limit that's based upon what's technologically available at the time. And they should have probably said it's 144. But if we all agree that that's what it was at the time, why waste time on a remand? It's enabled up to 144. And if that covers the excluded products, then a remand for them to tell us what they meant is kind of beside the point. We believe that this – You're just trying to get this knocked out as enabled at any range, right, so that the exclusion order goes away. We believe that the claims are enabled up to 144. And we have not challenged – Okay, wait. So the claims are enabled up to 144. The goods that are being excluded are at 144. Then what's the problem? Because the claims scope is not limited to 144. It says at least. It covers potentially – Not if we construe it as limited to 144. That's correct, but that was not what the ITC did. Let's just assume that that's the way we read their decision, that it's construed as limited to 144 because that was the inherent upper limit at the time. Then do we have a problem anymore, hypothetically? You don't have to accept all of that. We do not with one caveat, is that the post-priority date evidence is relevant to determine the scope of the claims at the time of the filing of the patent. And the scope of the claims, whether a limit is inherent in that scope, the ITC limited it to what was known in the arts, not what is inherent. An inherent upper limit is rare. And the corning chose to claim at least, and it undertook the risk of having to enable up to infinity. Now, if the claim were construed to be up to 144, we don't have a problem, except that it's not inherent. That is just known upper limit at the time. Okay. Do you want to say the rest of the rebuttal? Yes. Thank you. Ms. Chen? Good morning, Your Honors. May it please the Court. No remand is necessary in this case. The AOJ found that there is an inherent upper limit and that one of ordinary skill in the art would recognize that limit based on the technology, the state of the art, at the time of the priority date. So what is the inherent upper limit? The inherent limit is about 144. There was no dispute among the experts and the even respondents, engineers, that based on the state of the art at the time of the priority date. Did you say about because it's possible that other components could be made smaller such that it would give a tiny bit of wiggle room or something? Or why did you say about as opposed to the upper limit is 144? I said about because Corning's expert had testified that the upper limit is 144, but he didn't want to exclude the fact that maybe one additional adapter could be squeezed in. And that's also not the dispute of the enablement. FS.com does not question that perhaps one additional adapter could be squeezed in to the disclosed apparatuses. So is that what the ITC meant? Because I read it a little while ago, but I read it differently. I thought we were talking about numbers larger than the numbers in the claims and that the ITC inherently, wrong word, seemed to have accepted that the number could be larger and it just wasn't going to be pinned down to how much larger. Am I misconstruing what the ITC said? You seem to be saying the ITC said essentially the inherent limit is 144, give a minuscule amount, but they said at the end of the day they weren't going to give us an inherent limit, right? So why were they not willing to say the inherent limit is 144? No, I don't believe that that's the case, Your Honor. What FS.com's counsel is trying to say is the limit is up to infinity. But if you read the ALJ's initial determination, he found that there is the existence of an upper limit based on the state of the art. And what is that upper limit? And that limit is about 144. And that is not disputed by the experts, by the engineers. They attempted to, some of the respondents and engineers attempted to calculate an upper limit that exceeded, but nobody was able to make or use a fiber optic apparatus that exceeded what Corning was able to achieve in these patents. Also, as... Can you just confirm for me this exclusion order doesn't cover anything above 144? The exclusion order recites the claim limitations in the claims that at least 98 fiber optic connections. Now, there was no accused product that was... You're not instilling a huge amount of confidence in me by not answering yes. I'm sorry. Well, I mean, if we're going to agree with you that the ITC construed these claims to be limited to 144 in order for us to find that it's enabled, then presumably you can't exclude any products that have a number higher than 144, right? Right. That was not an issue before the commission. No, I understand, but, I mean... There hasn't been... Customs hasn't come to the commission asking whether any apparatus above 144 was trying to attempt to get in. And all of the accused products accommodate up to 144 fiber optic connections. Right. The commission's remedy is not on appeal. But not more. Right. That was not an infringement... If there's a newer invention that accommodates 500 or something, whatever multiple you're getting to, that's not covered by this patent, right? Again, that issue wasn't presented before the commission. I know, but I'm asking you hypotheticals. You need to answer my hypotheticals. Hypothetically, the ALJ construed the upper limit to be about 144. So in any future infringement proceeding, if a respondent was to come before the commission for an advisory opinion, that is the claim construction that the commission will be looking at, that customs will be looking at in determining whether these other products would be within the scope of the commission's orders or the scope of the commission's claims. And if they're in the 500 range, they're not within the scope, right? Hypothetically. Yeah, I mean, it's based on the claim construction that the ALJ found, that there was an upper inherent limit of 144. Well, I mean, you're not going to just be relying on the ALJ's construction if you win here. It's because we're going to be affirming your view of that, and it's going to be binding on the ITC. Because the general exclusion order says, quote, infringing high-density fiber optic equipment. The general exclusion order would, for example, encompass MDC adapters. I won't say what limit they're at, but it would, based on the way the exclusion order is written. MDC adapters are above 144 substantially. Well, that would be a problem. That's what we're trying to convey to you. And so I want to make sure that you don't understand this exclusion order to allow the ITC to exclude other kinds of adapters that are dramatically higher. I understand. And I don't agree with you in that the claims would go that high. In order to figure out what products are within the scope of the GEO, you have to look at what was construed by this court, by the statements made by Corning in the underlying investigation, what the ALJ found. And based on that claim construction, we would determine in an advisory procedure. Can I just ask you one more time to see if I can get a clear answer? If we construe this, that it only covers up to 144, then in the future you can't, based upon this patent, exclude things that go above 144. Is that right? That's right, Your Honor. And what about the exclusion order? Just as a practical matter, I don't know how this thing operates, but I'm sure the customs officers don't sit there with a stack of our opinions to ascertain how we construe claims. I think they look at the exclusion order. So will you modify the exclusion order once you get an opinion? I mean, I'm not sure why it's as broad as the Chief read it anyway, but is that what will happen? I don't believe the exclusion order will be read that broadly. As you say, the claim construction is that there was an inherent upper limit of about 144 fiber optic connections. And the exclusion order has to be read in conjunction with the commission opinion and this court's opinion later on in determining what products are within the scope of the exclusion order. And, again, there is no, or at least to the commission's knowledge, no hypothetical product currently that has these upper densities above 144. But if that was the case, they would come before the commission, they could come before customs for a determination. What would be the harm in us, given that there's an apparent lack of clarity, even if we agree with you that this is the claim construction limits to 144, because the ITC's decision on this is fuzzy at best, I think, to send it back and just say, you need to modify your exclusion order to specifically call out 144. It would still be a valid exclusion order, but it would just be plain on its face what it calls. The problem with that is by specifying 144... Up to. Up to 144, FS.com has not shown undue experimentation with adding an additional adapter. It's not exactly 144. It is upon respondents' burden to show undue experimentation. Here, there are only evidence regarding enablement. Okay, if we say about 144, because one more adapter is going to add 15 to 20. It's not going to add 300. There would be perhaps litigation regarding what is the construction of about 144. Oh, my goodness. So I don't know what benefit there would be to ask the commission to recite what exactly is the upper limit. Here, it would have to be construed based on what the commission found and based on what this court will say in its opinion. But the ALJ found that there was substantial evidence supporting an upper limit of about 144. Okay, we need to hear from the other lawyer. Can I just indulge for one or two minutes? Yes, there's another issue in this case, and I want to confirm that nothing we do is going to affirm what was done in connection with the arguments of inducement and nexus and so forth. Page Appendix 32 of the ITC opinion says something that I find at least questionable, and it's about something that I understand wasn't decided in Suprema. I want you to know whether you agree with me, and that is the time at which the inducement has to occur. Because the commission says here, before, during, or after, none of that matters as a matter of law. And they also cite Corning, I guess, for the fact that their reasoning about that was quoted by the Federal Circuit with approval that the location of Comcast's inducing conduct is not legally relevant. And I don't want to take your time to look at what they cited in Corning, but it's not my understanding that we cited what they're saying we cited with approval. Do you have any comment on that? Do you understand what I mean? I don't believe that's what the commission's opinion states, and I believe you're referring to the Comcast opinion. No, I'm looking at Appendix 32 of this case, and I'm saying that the commission is citing Comcast as saying that we, in our opinion in Comcast, we quoted with approval what the commission thinks is the law, which is it doesn't matter whether infringement happens before, during, or after. And I don't think that's accurate. Am I misunderstanding something? The commission was not saying that it doesn't matter when the infringement happened. And there in Comcast, the inducing activity had occurred before, during, and it occurred before. Well, it says, in other words, inducing activities can occur before, during, or after importation. Have we decided that issue? We, the Federal Circuit? No, and we don't cite Comcast after that sentence, Your Honor. That was in Comcast, the inducing activity occurred before importation because of the design of the set-top boxes that was relevant in Comcast. And we had argued that the inducing activity also occurred during importation with the act of importation. Well, I'm reading what the ITC said, and I'm glad for your clarification. I mean, it says the location, the Federal Circuit quoted with approval that the location of Comcast's inducing conduct is not legally relevant. In other words, it can occur before, during, or after. It seems like the ITC thinks that that's the law of our circuit, and I just want to clarify whether you think that. No, that was not. Okay, thank you. Sorry to take your time. All right, thank you. Mr. Chen? Good morning, Your Honors. Thank you, Chief Judge Moore, and may it please the Court. I'd like to begin by addressing Judge Hugh's question about modification of the order. One thing that I would like to make clear is that while this appeal has focused on the range claims of the 320 and 456 patents, there are other patents involved that do not have density elements to them. So if you, for example, hypothetically had a device that satisfied the claims of the 133 patent but used a more recently invented adapter, I don't think there's any contention that that wouldn't be enabled, even by the other side. So I don't think the exclusion order should be modified to completely exclude things that might meet the claims of the 153, which is no longer challenged on this appeal, but that Your Honor might construe to be outside of the inherent limit of the 320 and the 456. With respect to the question, I would also just like to clarify that all the devices at issue in this case are at 144. They do exactly what Corning invented. They do it exactly the way that Corning invented it. There is some, you know, we had suggested, I think, and I would suggest now that the Court doesn't need to reach the question of what would infringe going forward. There's language in this Court's decision, sorry this Court's predecessor decision in Hogan, and then this Court's decision in Kiron that when you have later developed art that would allow a result that wasn't enabled at the time but is within the scope of the claims that the inventor might be able to claim that. Yes, but I think your problem is that we don't think it's within the scope of the claims. And so it makes a lot of good sense for us to say that because if you think 432 is within the scope of the claims, then these claims are not enabled. If that is your view, Your Honor, then you should construe the claims to say that. And, you know, we had certainly reserved below the possibility that we might make a different argument based on Hogan and Kiron. But if that's not, I understand Your Honor's position on that. I do want to make clear, because it did come up in the briefs, that we did not at any time before the Commission assert that any device that these patents, that the range claims in particular, read on any devices that were above 144. There was an assertion on reply that we had made that type of argument in connection with the domestic industry showing. And I would like to refer the Court specifically to pages 21411 to 21412. That's our post-hearing brief. 21594, that's our post-hearing reply. And to the expert testimony at 151241 to 242. What would you have us do with this about 144 argument? What would you have us, how would you have us write this opinion if that's something that we need to consider? If you determine that you need to consider it, Your Honor, I would have you cite the language in Anderson v. Fiber Composites that says that the upper limit must be, inherent upper limit must be apparent to one in skill of the art, but need not be precisely known. And I do want to come back to the point, Your Honor, that it actually, it really is their burden to show lack of enablement, and it is not, it was not our burden to establish. Well, could I, could we write the opinion to explain that about 144, the only reason it's not limited to 144 is because there was an assertion of the possibility of squeezing one more adapter in, and so one more adapter that was present in the prior art would have potentially allowed slightly above 144? Is that the argument? That is the state of the record, Your Honor, and I think that would be an accurate characterization. No one has actually tried to market such a product. You generally want the devices to be in these other data codes. Sure, but if they've got an exclusion order on their products and they can squeeze in something that gets them above 144, they might try if we limit it to strictly 144. Right, so I think that for that reason it would be appropriate to say that the presence or absence of one additional adapter would not be relevant to the enablement question, which is assessed as of the time of the, as of the art, as of the time of priority. I, you know, on the question whether the post-priority art was appropriately excluded, I think what was attempted here is very much what was said to be improper, not only in Hogan and in Curran, but also in this Court's decision in Amgen. It was an attempt to use post-priority art, essentially to invalidate the patent for failing to do the impossible, which was to predict future developments in the art. I mean, I don't know what I'm missing. I don't see any problem with the post-priority day art coming in in this case simply to inform the Court as to what the state of the art was at the time, because there's an, it's been determined that a skilled artist would understand there's an inherent limit of approximately 144. So showing that maybe, you know, 10 or 20 years down the road, somebody came up with a way to make it 500 or 1,000 or whatever, I mean, I don't see why that would need to be excluded and why it couldn't be sort of further evidence of what the state of the art was at the time. I think, so is Your Honor suggesting then that it would come in to support us essentially by showing, by illustrating? I don't see any harm for you in it coming in. I don't know why you need to fight this battle, given the way this panel seems to be moving. Then I will cease fighting that battle, Your Honor. And if the Court has any questions on the 206 and the multiple openings question, no. Then I will respectfully request that the commission's conclusion order be affirmed. Very good. Ms. Gavini, you have a little time. I just want to make one point, and I think that this Court's discussion of the exclusion order and my colleagues' refusal to admit that the exclusion order excludes much more than 144 just proves the point that it needs clarification. The commission's decision was unclear. Well, what needs clarification is what the scope of these claims are. But if the exclusion order is based in part on other patents, no longer in this action and therefore not in front of us, how do I know that those other patents don't cover a range higher than 144? It's not up to me to determine. Nobody asked me in this case to determine the scope of the exclusion order or presented me with evidence of all of the things the ITC utilized when it came up with the exclusion order. So the other patents that are no longer here do not recite open-ended range claims. But that's not in front of us. I mean, does it really make any difference if our decision construes it at the 144, about 144 level? Then if they try to exclude stuff that is not about 144, it's a lot greater, then your clients or whoever can come back and say, that's improper based upon this Court precedent. Why does it need to be written into the exclusion order when our boss on the exclusion order upholding it says that? That would be perfectly acceptable to us. Okay. Okay, I think all the counsel in this case has taken their submission.